FILED
2026 Sep-21 AM 11:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

**MACKENZIE HAWKINS,**
Plaintiff,

**v.**

**ROBIN GRANT,**
Defendant.

**Case No. 4:23-cv-1406-CLM**

# MEMORANDUM OPINION

Plaintiff MacKenzie Hawkins sues Defendant Robin Grant for unlawful deadly force under 42 U.S.C. § 1983. Grant moves for summary judgment. (Doc. 53). Mrs. Hawkins objects to Grant's summary judgment motion relying on evidence that she contends is inadmissible. (Doc. 65). For the reasons stated within, the court **DENIES** Grant's motion for summary judgment (doc. 53) and **DENIES AS MOOT** Mrs. Hawkins' objections (doc. 65).

## I. Background[1]

Mrs. Hawkins is the surviving spouse of Anthony Hawkins. Grant is a deputy with the Etowah County Sheriff's Office. Grant attended the Northeast Alabama Police Academy in 1999. (Doc. 54-2, p. 6) Grant worked for various law enforcement agencies across Alabama until 2010, when he returned to Etowah County to work as an investigator for the Etowah County Sheriff's Office ("ECSO"). (*Id.*, pp. 6–7).

On October 28, 2022, Grant went in to work around 8:00 A.M. (*Id.*, p. 18). ECSO typically had a morning meeting where deputies were assigned reports on the crimes and/or incidents that occurred the day before. (*Id.*). Around 9:00 A.M., Grant began a "routine patrol" in west Etowah County.

[1] The court gleans these facts from the parties' submissions and the court's own examination of the record. The court resolves all reasonable doubts about the facts in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the facts that would be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

(*Id.*). A "routine patrol" is when deputies drive through neighborhoods looking for suspicious activity or potential crimes without searching for any specific person. (*Id.*). At the time Grant began his patrol, it was a bright, sunny morning. (*Id.*).

When Grant left for routine patrol, he was not wearing a body camera. (*Id.*). While ECSO Policy required uniformed members to be equipped with a working body-worn camera before going on duty, (doc. 63-7, p. 1), ECSO never issued Grant a body-worn camera (Doc. 54-2, p. 43). Grant and others testified that investigators like Grant did not wear body-worn cameras, even during routine patrols rather than investigative work. (*Id.*; Doc. 63-3, p. 10). Captain Will Farley testified that investigators did not wear cameras because ECSO only had enough cameras to cover patrol deputies, and investigators typically conducted interviews in rooms that were already recorded. (Doc. 63-3, p. 10). Grant's truck also did not have a dash cam or other mounted camera, but it was equipped with lights and sirens. (Doc. 54-2, pp. 18, 42).

**A. Grant begins vehicle pursuit of Hawkins**

Grant testified that, around 10:00 A.M., he was driving along Egypt Road in western Etowah County when he spotted an all-terrain vehicle driving in the oncoming lane. (*Id.*, p. 18). Hawkins was the driver of the ATV, and the ATV did not have a license plate or any rearview mirrors. (Docs. 54-5, pp. 3-6; 54-2, p. 46). After Grant met Hawkins on the road, he decided to pursue him because ATVs are "not street legal" and "[Hawkins] was breaking the law." (Doc. 54-2, pp. 18-19).[2]

[2] Mrs. Hawkins disputes that operating an ATV on the roadway in this location was in fact prohibited by any Alabama statute or local ordinance. However, under Alabama law, ATVs are manufactured and intended for off-road use rather than operation on public highways. *See* Ala. Code § 32-12A-1(2) (defining an "[a]ll-terrain vehicle" as a motor vehicle designed primarily for off-road travel on four or more nonhighway tires). Alabama's vehicle registration laws and regulations likewise distinguish ATVs from vehicles that may be lawfully operated on public roads. The Alabama Department of Revenue provides that vehicles designated by the manufacturer as "for off road use only," including ATVs, are not eligible for title or registration as highway vehicles unless they satisfy applicable federal motor vehicle safety standards. Ala. Admin. Code r. 810-5-1-.238. Because Alabama law generally requires motor vehicles operated on public highways to be properly registered and, where applicable, titled, an ATV that is ineligible for highway registration cannot

According to Grant, it took a mile for him to catch up to Hawkins because he was going "as fast as the four-wheeler [would] go." (*Id.*, p. 18). But Robert Adams, a third-party witness who observed the pursuit for approximately 15 seconds, testified that Hawkins was traveling at around 20-25 miles per hour, maintaining a constant speed "like he was out on a Sunday afternoon ride," with no indication that Grant was closing the distance rapidly. (Doc. 54-6, pp. 6–7, 13–15).

At 10:29:27, Grant called in a four-wheeler refusing to stop on Egypt Road near the intersection with Holiday Circle and heading toward Rockledge. (Doc. 54-3, p. 2). Grant testified that he activated his lights and sirens (Doc. 54-2, p. 18), but two third-party witnesses testified that they observed Hawkins and Grant during parts of the chase and did not hear sirens. (Docs. 54-6, pp. 13–14; 63-8, pp. 13, 17). At 10:30:07, Grant called in that Hawkins was "still refusing to stop" as the two passed Old Mink Farm Road, still heading toward Rockledge. (Docs. 54-3, p. 2; 54-2, p. 21).

Grant testified that Hawkins "slammed his brakes . . . at least three times." (Doc. 54-2, p. 20). But both third-party witnesses Robert Adams and Blake Haynie testified that they never observed Hawkins attempt to slow down and cause a wreck, and no physical evidence (such as skid marks) corroborates Grant's account, nor did investigators attempt to locate any such evidence. (Docs. 54-6, pp. 13–15; 63-8, p. 12; 63-6, p. 55; 63-10, p. 15; 63-11, p. 10). At 10:30:32, Grant called in that Hawkins was "trying to slam on the brakes a couple of times," about 30 seconds after he reported passing by Old Mink Farm Road. (Doc. 54-3, pp. 2–3). At 10:30:42, Deputy Cody Eubanks indicated over the radio that he was en route to Grant's location. (Docs. 54-4, p. 7; 54-3 at 4).

At 10:30:47, Grant reported that he was turning on to Walker Mountain Road, and Deputy Jamie Rowan stated over the radio that "that's probably going to be that Hawkins subject." (Docs. 54-7, p. 7; 54-3, p. 4).

---

ordinarily be lawfully operated on public roads. *See* Ala. Code §§ 32-6-51, 32-8-30(a); Ala. Admin. Code r. 810-5-1-.238.

Deputy Rowan[3] was familiar with Hawkins because he had attempted to flee Rowan on an ATV before. (Doc. 54-7, pp. 7, 9) Grant responded "10-4" to Deputy Rowan's report and described Hawkins' clothing and vehicle. (Doc. 54-3, p. 5).

**B. Grant begins foot pursuit of Hawkins**

At 10:31:26, Grant reported over the radio that Hawkins had "hit the woods" about halfway up Walker Mountain. (*Id.*). Grant identified the location where Hawkins entered the woods as roughly the halfway point between where Walker Mountain Road intersected with Egypt Road and another intersection with Sunset Trail, about a mile off Egypt Road. (Docs. 54-8, p. 2; 54-2, p. 25; 54-3, p. 13; 54-7, p. 13). Hawkins veered off from the left side of the road. (Doc. 54-2, p. 25).

When Hawkins entered the woods, Grant pursued Hawkins on foot. (Doc. 54-2, p. 24). Grant testified that he continued the pursuit on foot because he "couldn't chase [Hawkins] through the woods in [his] truck" and he "still felt there was a need to talk to him to find out what was going on." (*Id.*, pp. 25–26). Though Grant admits that he had no reason to believe Hawkins had committed any violent offense and was unaware of any immediate threat Hawkins posed to the public. (*Id.*, pp. 24, 29). Grant knew Hawkins was armed because he could see that he had a compound bow and arrow on the back of his ATV, but Hawkins never reached for the bow. (*Id.*, p. 29). Grant also knew that other officers were on the way. (*Id.*, p. 26). Grant stated that he was attempting to keep sight on Hawkins until they could set up a perimeter. (*Id.*).

Grant entered the woods on foot around the same place where Hawkins had entered driving his ATV. (*Id.*, p. 27). He followed Hawkins approximately 10 to 15 yards into the woods before Hawkins turned around and saw Grant following him. (*Id.*, p. 30). Grant testified that, at that time, he saw that Hawkins was holding a large knife in his right hand, and there was a long

[3] Deputy Rowan's prior interactions with Hawkins were "actually good." Hawkins never threatened Deputy Rowan or drove erratically toward him, and Hawkins's identity and residence were known among ECSO deputies such that Rowan would typically discontinue pursuit of him rather than escalate. (Doc. 54-7, pp. 7, 10–12).

gun by the right foot peg of the four-wheeler. (*Id.*). Mrs. Hawkins disputes that Hawkins could have been holding a knife in his right hand in the manner Grant described while simultaneously operating the ATV's throttle, which was located on the right handlebar beneath a large hand-warmer covering the entire grip area. (Docs. 63-13; 63-6, pp. 47-51; 63-19, p. 5; 54-20, p. 20).

As soon as Hawkins and Grant made eye contact, Hawkins made a sharp U-turn and began driving back toward the roadway. (Doc. 54-2, p. 30). Grant also turned and ran back to the road. (*Id.*). When Grant got back to the road, Hawkins was off to his left in the woods by about five yards. (*Id.*, p. 31).

**C. Grant shoots Hawkins**

According to Grant, Hawkins then "jerked the wheel," turned the ATV directly at him, and "gunned" it, closing the distance between them in about half a second. (Doc. 54-2, pp. 31, 55). Grant says that he responded by raising his left hand and shouting three warnings for Hawkins to stop, keeping his right hand on his still-holstered weapon throughout. But Grant testified that Hawkins disregarded these warnings and struck Grant's left arm or hand with the ATV, knocking him down into a nearby ditch. (*Id.*, pp. 31, 33–34). Grant also claims that he drew his weapon only moments before the ATV reached him, that Hawkins was still holding the knife pointed upward from the handlebar at the moment of impact, and that he had no opportunity to retreat, de-escalate, or otherwise subdue Hawkins. (*Id.*, pp. 33–35, 37, 47). Grant says he then fired five rounds in rapid succession, stopping only once he saw Hawkins fall from the ATV. (*Id.*, pp. 35–36, 38). A third-party witness, however, described two distinct rounds of gunfire separated by 10 to 15 seconds instead of a single continuous burst. (Doc. 63-8, pp. 11–12, 16–18).

Grant's testimony regarding his position relative to the road and to Hawkins immediately before the alleged collision was inconsistent: at times, he described his location as "in the woods," "on the upside of the ditch," and "on top of the ditch," and estimated his distance from Hawkins at anywhere from four or five yards, to seven yards, to three yards from the roadway. (Doc. 63-2, pp. 30–32). And body-worn camera footage recorded minutes after the shooting captured Grant telling a fellow deputy that Hawkins "didn't run me

over with a four-wheeler." (Doc. 54-32 at 2:19-2:34).[4] Plus, despite his claim that the ATV struck his arm or hand, Grant sustained no documented injuries to either his arm or hand. (Docs. 63-6, p. 53; 63-2, p. 44).

Grant radioed that shots had been fired at 10:32:05 and reported "subject down" 18 seconds later, at 10:32:23. (Docs. 54-3, p. 6; 54-2, p. 38). The shooting occurred roughly halfway up Walker Mountain Road. (Docs. 54-11, p. 13; 54-12, p. 2).

Soon after the shooting, other officers arrived on the scene, with Deputies Jameson Jenkins and Davian Smith arriving first. (Doc. 54-11, p. 13). At that time, Grant was standing next to Hawkins. (*Id.*, p. 14; Doc. 54-32). Because Deputy Jenkins was one of the first to arrive, he was in charge of the scene. (Doc. 54-11, p. 14). While securing the scene, officers saw a tactical combat knife by Hawkins's body. (Doc. 54-7, p. 14) The knife was unsheathed, but no fingerprint analysis was performed on the recovered knife. (*Id.*). A knife sheath was also located near Hawkins' body. (*Id.*).

Hawkins' autopsy determined that his cause of death was "multiple gunshot wounds." (Doc. 54-15, p. 4). The autopsy showed that all five gunshot wounds entered from the back or left side of Hawkins' body with a left-to-right, back-to-front trajectory, and there were no entrance wounds on the front of Hawkins's body:

[4] The court recognizes that Grant disputes that he told the other deputy that Hawkins "didn't run me over with a four-wheeler." But the court has watched the bodycam footage many times and agrees with Mrs. Hawkins that a reasonable jury could find that Grant said that Hawkins didn't run him over.




(Docs. 54-16; 54-17, pp. 17–18, 25; 54-15, p. 4.)

**D. Etowah County Sheriff's Office Policies**

Etowah County Sheriff's Office deputies weigh several factors when deciding whether to continue a vehicle pursuit, including weather conditions, terrain, risk to bystanders and pedestrians, and the suspect's speed. (Doc. 54-2, p. 24). On the day of the incident, the morning was clear, no pedestrians were present, and Grant identified no other safety concerns that would have warranted terminating the pursuit. (*Id.*).

Etowah County Sheriff's Office policy permits a deputy to begin a pursuit "when it is reasonable to believe that a suspect, who has been given an appropriate signal to stop by a law enforcement officer, is attempting to evade arrest or detention by fleeing in a vehicle." (Doc. 54-23, p. 4). A pursuit should be terminated only when the totality of objective circumstances known, or reasonably knowable, to the deputy indicates that the risks of continuing outweigh the risks of allowing the suspect to escape. (*Id.*, p. 5). In

making that assessment, deputies must weigh the seriousness of the suspected offense against the potential danger to themselves, innocent motorists, and the public. (*Id.*) Deputies should also consider terminating a pursuit when the gap between vehicles grows large enough that the suspect is lost from sight, the pursuit enters a congested area, the deputy's lights or sirens become inoperable, or the suspect's location becomes unknown. (*Id.*, pp. 5-6). The policy further discourages extended pursuits of violators for misdemeanors not involving violence or weapons, independent of the pursuit itself. (*Id.*).

For foot pursuits, deputies must "continuously balance" the goal of apprehending the suspect against the risk of injury to themselves, the suspect, and the public. (Doc. 54-24, p. 3). A deputy may pursue on foot "any individual that the deputy reasonably believes is about the engage in, is engaging in, or has engaged in criminal activity." (*Id.*) Deputies should also "continuously consider" reasonable alternatives to foot pursuit, including containment of the area, saturation of the area with law enforcement personnel, a canine search, thermal imaging or other sensing technology, air support, or delayed apprehension at another time when the suspect's identity is known or information exists that would likely enable a later arrest. (*Id.*, pp. 3-4). The policy also provides that "mere flight" does not, by itself, justify engaging in an extended foot pursuit, and that surveillance and containment are generally the safest tactics for apprehending a fleeing person. (*Id.*, p. 3).

With respect to use of force, Sheriff's Office policy authorizes deputies to use only the amount of force that "reasonably appears necessary" given all the facts at hand, including force necessary to defend themselves against an imminent threat from a suspect. (Doc. 54-25, pp. 4-5). Reasonableness is evaluated from the perspective of a reasonable deputy on the scene and accounts for factors such as the severity of the threat to law enforcement or civilians, the suspect's conduct, suspected drug use or mental state, the proximity of weapons, the degree to which the suspect has been restrained, the availability of other options, the seriousness of the suspected offense, the risk of injury to law enforcement and others, the consequences of the suspect's escape, and whether the suspect is resisting or fleeing arrest. (*Id.*).

Deputies may use deadly force when they reasonably believe there is an imminent threat of death or serious bodily injury. (*Id.*, p. 7). When reasonable, a deputy must first attempt to identify himself as a peace officer and warn that deadly force may be used, unless the deputy has "objectively reasonable grounds" to believe the person is already aware of those facts. (*Id.*). "When feasible, deputies should take reasonable steps to move out of the path of an approaching vehicle instead of discharging their firearm at the vehicle or any of its occupants," and a deputy should only discharge a firearm at a moving vehicle when no other reasonable means are available to avert the threat. (*Id.*). While a deputy should take reasonable steps to get clear of a moving vehicle's path, deadly force is permitted when the deputy reasonably believes there is no other means to avoid the imminent threat posed by the vehicle. (*Id.*).

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of a material fact. *See id.* at 323. Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*,

477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III. Discussion

At this Rule 56 stage, the only question presented is whether Grant is entitled to qualified immunity from the claim that he violated Hawkins' Fourth Amendment right to be free from excessive deadly force. For the reasons explained below, he is not.

### A. Grant is not entitled to qualified immunity from the claim of excessive force causing wrongful death.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This doctrine 'balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333 (11th Cir. 2024) (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010)). When qualified immunity attaches, it "grants officials 'an entitlement not to stand trial.'" *Miller*, 129 F.4th at 1333 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

"To be eligible for qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

Mrs. Hawkins doesn't dispute that Grant was acting within the scope of his discretionary authority when he pursued Hawkins during his routine patrol of west Etowah County. (Doc. 66, p. 30).

Thus, the burden shifts to Mrs. Hawkins to establish that qualified immunity does not apply. *Edwards v. Grubbs*, 179 F.4th 909, 924 (11th Cir. 2026). Mrs. Hawkins meets this burden by proving (1) a violation of a constitutional right (2) that "was clearly established at the time of [Grant's] alleged misconduct." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021) (internal quotation marks omitted).

**1. Whether Grant violated a constitutional right**

"The Fourth Amendment provides a 'right of the people to be secure in their persons . . . against unreasonable . . . seizures.'" *Baxter v. Santiago-Miranda*, 121 F.4th 873, 887 (11th Cir. 2024) (quoting U.S. Const. amend. IV). "The Fourth Amendment's freedom from unreasonable seizures includes the right to be free from excessive force." *Id.* Federal courts "measure excessive-force claims" by "ask[ing] whether the officer's conduct was objectively reasonable in light of the facts confronting the officer." *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (cleaned up).

To determine when "the use of deadly force is 'reasonable' for purposes of the Fourth Amendment," courts should consider whether the officer who applied such force: (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm," (2) "reasonably believes that the use of deadly force was necessary to prevent [the suspect's] escape," and (3) "has given some warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323, 1329-30 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)). In evaluating these factors, the court is required to "view[] the facts and draw[] all reasonable inferences in [the plaintiff's] favor." *Id.* at 1330. "Although these factors are useful, [the court] cannot apply them mechanically, and [the court] must still slosh [its] way through the factbound morass of reasonableness." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (first citing *Penley v.*

*Eslinger,* 605 F.3d 843, 849-50 (11th Cir. 2010), then quoting *Scott v. Harris,* 550 U.S. 372, 383 (2007)) (internal quotations omitted).

As to the first *Garner* factor, a reasonable officer has probable cause to believe a suspect poses a threat of serious physical harm to the officer or another "where the plaintiff used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *Underwood*, 11 F.4th at 1329 (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009)) (cleaned up). But the details of such an encounter are important. The Eleventh Circuit has determined that an officer reasonably used deadly force when a suspect started driving toward him at one to two miles per hour, threatening to crush him against another car in a matter of seconds. *Robinson v. Arrugeta*, 415 F.3d 1252, 1254, 1257 (11th Cir. 2005). And it also determined that a reasonable officer would believe probable cause existed where a suspect led an officer on a high-speed chase through commercial and residential areas and across state lines, wrecked, and then drove the car in reverse within two feet of the officer. *Tillis v. Brown*, 12 F.4th 1291, 1294 (11th Cir. 2021).

On the other hand, the Eleventh Circuit has determined that a reasonable officer would not have believed probable cause existed where an officer "was still eight feet away from" a vehicle, the suspect was "idling and inching forward," and the suspect did not accelerate the vehicle until after the officer had fired shots. *Underwood*, 11 F.4th at 1329-30. It has also determined that a reasonable officer would not believe that probable cause existed when the plaintiff saw the police vehicle; denied accelerating his car; and claimed that he drove away in a non-threatening way, was merely coasting, saw no one in front of his car, and came to a stop before an officer shot him seven times. *Morton*, 707 F.3d at 1281-82; *see also Vaughan*, 343 F.3d at 1330 (reversing summary judgment granting qualified immunity when a plaintiff alleged that although he was speeding, fleeing and earlier had accidentally hit the rear of a police car, he at the time of the shooting was in a lane "clear of traffic" and had "made no aggressive moves to change lanes before [the officer] fired" three rounds into the truck without warning).

Applying these principles to this record, the court concludes that there is a genuine dispute of material fact about whether Grant had probable cause to believe Hawkins posed a threat of serious physical harm when Grant opened fire. Grant admits that when he decided to follow Hawkins into the woods, he had no reason to believe Hawkins had committed any violent offense and that he was unaware of any immediate threat Hawkins posed to the public. (Doc. 54-2, 24–25, 29). Grant also gave shifting descriptions of his own location relative to the road and to Hawkins immediately before the alleged collision (variously "in the woods," "on the upside of the ditch," and "on top of the ditch") and offered distance estimates ranging from three to seven yards. (Doc. 63-2, pp. 30–32). Although Grant claims the ATV struck his arm or hand with enough force to knock him into a ditch, he sustained no documented injury to either his arm or hand. (Docs. 63-6, p. 53; 63-2, p. 44). And on body-worn camera footage recorded minutes after the shooting, Grant told a fellow deputy that Hawkins "didn't run [him] over." (Doc. 54-32 at 2:19-2:34).

The autopsy results could also cause someone to doubt Grant's story: all five gunshot wounds entered from the back or left side of Hawkins' body, with no entrance wounds on the front. (Docs. 54-17, pp. 18, 25; 54-15, p. 4; 54-16). A reasonable juror could find rear or side-entry wounds difficult to reconcile with Grant's account of Hawkins bearing down on him head-on.

It is also genuinely disputed whether Hawkins was wielding a knife at the time of the shooting. At one point, Grant said that Hawkins was holding the knife "up in the air" in his right hand and "in a threatening position" at the time Grant claims he was struck. (Doc. 63-2, p. 36). But Grant later said that he did not "know if [the knife] was in [Hawkins'] hand or not." (*Id.*, p. 46). And as Mrs. Hawkins notes, there is a fact dispute over whether it was even possible for Hawkins to drive his ATV and hold a knife at the same time. To be sure, Grant's own expert agreed that it would have been impossible for Hawkins to hold a knife up in the air with his right hand while using his ATV's throttle to accelerate. (Doc. 54-20, p. 20).

Even the vehicle pursuit that preceded the foot chase is genuinely disputed: a third-party witness who observed part of the chase testified that Hawkins maintained a constant, moderate speed of 20-25 miles per hour "like

he was out on a Sunday afternoon ride," with no indication that Grant was closing on him rapidly, and no physical evidence corroborates Grant's testimony that Hawkins slammed his brakes three times in an apparent attempt to cause a wreck. (Docs. 54-6, pp. 7, 13–15; 63-8, p. 12; 63-6, p. 55; 63-10, p. 15; 63-11, p. 10).

In sum, a jury that believed Grant could reasonably decide that Grant had probable cause to believe that Hawkins posed a serious threat of physical harm. A jury skeptical of Grant's account could find that other evidence, particularly the autopsy report and statement that Hawkins "didn't run me over," showed that Hawkins posed no serious threat because he was driving away from Grant at the time of the shooting. That is precisely the kind of credibility dispute that cannot be resolved at summary judgment. *See Anderson*, 477 U.S. at 255.

The second *Garner* factor—whether force was necessary to prevent escape—is also genuinely disputed. Viewing the evidence in the light most favorable to Mrs. Hawkins, Grant knew who Hawkins was, where he lived, and that other deputies were converging on the scene. (Doc. 54-2, pp. 23, 26–27). Under *Vaughan*, when a suspect is readily identifiable and later apprehension is feasible, a jury may find deadly force unnecessary to prevent escape. *Vaughan*, 343 F.3d at 1330-31. And under *Garner*, flight alone does not justify deadly force absent a threat to others. *Garner*, 471 U.S. at 11.

As to the third *Garner* factor, Grant doesn't say that he warned Hawkins about the potential use of deadly force. Whether a warning was feasible is a question for the jury.

Because there are genuine disputes of material fact regarding the circumstances surrounding the shooting, the court cannot conclude as a matter of law that Grant's use of deadly force was objectively reasonable. A reasonable jury could find that Grant violated Hawkins' Fourth Amendment right to be free from excessive force. Mrs. Hawkins has therefore satisfied the first prong of the qualified immunity analysis.

### 2. Whether Grant violated clearly established law

Even if a jury could reasonably find that the deputies violated Hawkins' Fourth Amendment rights, Grant is nevertheless entitled to qualified immunity if that right was not clearly established. *See Morton*, 707 F.3d at 1282.

A plaintiff can show a right was clearly established in one of three ways: (1) materially similar precedent from the Supreme Court, the Eleventh Circuit, or the relevant state supreme court; (2) a broader principle that clearly controls the novel facts presented; or (3) conduct so obviously unconstitutional that no case law is needed. *Powell v. Snook*, 25 F.4th 912, 920-21 (11th Cir. 2022). In all three, the ultimate question is whether the law at the time gave the officer fair warning that his conduct was unlawful. *Id.* at 921. Mrs. Hawkins satisfies the first method here: materially similar Eleventh Circuit precedent gave Grant fair warning that his conduct, when viewed in a light most favorable to Mrs. Hawkins, was unconstitutional.

Grant argues that under *District of Columbia v. Wesby*, Mrs. Hawkins must identify a case addressing an officer in his exact position – alone, in the woods, facing a charging ATV – and that none exists. 583 U.S. 48, 63-64 (2018). *Wesby*'s specificity requirement does govern this analysis, but Grant's framing assumes the very fact that remains disputed: that Hawkins was charging at Grant when he fired. Viewed in the light most favorable to Mrs. Hawkins, Hawkins was several yards away, moving along a path back toward the road rather than accelerating toward Grant.

So the relevant question under *Wesby* is not whether a case addresses a charging ATV, but whether one addresses an officer who uses deadly force on a suspect a jury could find was driving away from the officer. It does: *Underwood* held that a reasonable officer lacks probable cause to believe he faces a threat of serious physical harm where the suspect's vehicle has not been driven in a threatening or aggressive manner and no warning was given. 11 F.4th at 1329-32. And *Morton* held that deadly force is likewise unjustified against a suspect who denied accelerating his vehicle toward the officer and said that he had put the car in park before the shooting. 707 F.3d at 1281-83. Both decisions predate this shooting and gave Grant fair warning

that firing on Hawkins while he was driving away would violate the Fourth Amendment. Because *Underwood* and *Morton* had already clearly established that deadly force is not justified under such circumstances, Grant is not entitled to qualified immunity at this stage.

### B. Mrs. Hawkins' Objections to Inadmissible Evidence

Mrs. Hawkins objects to evidence and testimony about (1) Hawkins' prior burglary and his being found in possession of stolen property; (2) Hawkins' drug use, drugs found on his person, and any speculation about how either affected his state of mind; (3) Grant's testimony regarding why Hawkins fled; (4) Grant's written statement; (5) unsworn expert reports; (6) photographs taken by defense expert Jeff Goudeau; and (7) Goudeau's opinion that Hawkins could have easily operated the ATV's throttle while holding a large knife in his right hand. (*See generally* Doc. 65).

Because consideration of this evidence does not affect the outcome of the court's opinion, the court **WILL DENY** Mrs. Hawkins' objections (doc. 65) **AS MOOT**. If this case is set for trial, the court will set deadlines for motions in limine, and the arguments in Mrs. Hawkins' objections may be reasserted.

## IV. Conclusion

For the reasons explained above, the court will **DENY** Grant's motion for summary judgment (doc. 53) and **DENY AS MOOT** Mrs. Hawkins' objections (doc. 65). The court will enter a separate order that carries out this ruling.

**DONE** and **ORDERED** on September 21, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE